NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200100-U

NO. 4-20-0100

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 20, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.B., P.B., J.B., and D.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 17JA65 |
| v. | ) | |
| Dana W., | ) | Honorable |
| | ) | J. Brian Goldrick, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: By finding respondent to be an "unfit person" (750 ILCS 50/1(D)(m)(ii) (West 2018)) and by finding it would be in the best interests of her children to terminate her parental rights, the trial court did not make findings that were against the manifest weight of the evidence.

¶ 2    In June 2017, the State filed a petition for adjudication of neglect with respect to four boys, the minor children of respondent, Dana W. In September 2017, upon respondent's admission, the trial court adjudicated the minors neglected, made them wards of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). In May 2019, the State filed a motion to terminate respondent's parental rights. In January 2020, the court found respondent was an unfit parent within the meaning of the Adoption Act and held the minors' best interests would be served by terminating her parental rights.

¶ 3    On appeal, respondent argues the trial court erred in terminating her parental rights;

specifically, she alleges the court erred (1) in denying her motion for a directed finding after the State's presentation of evidence at the fitness hearing, (2) by excluding certain testimony at the fitness hearing, (3) in finding she was an "unfit person" within the meaning of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2018)), and (4) in finding it was in the best interests of her four children to terminate her parental rights. We are unconvinced that any of the above constituted errors. Therefore, we affirm the court's judgment.

¶ 4                                                    I. BACKGROUND

¶ 5              Respondent is the mother of four boys: D.B., born September 17, 2005; J.B., born August 27, 2008; P.B., born September 2, 2010; and L.B., born April 15, 2012. On June 23, 2017, respondent took L.B. to the emergency room after he was bitten by a dog. According to hospital staff, all four minors were "filthy" and "had no clothes." The treatment providers were not convinced the minor's injuries were consistent with a dog bite. The hospital notified the police, who, upon seeing the minors, took the boys to get food and clothes. Respondent seemed to be "on something" and was reportedly "out of it," as she had no reaction to L.B.'s injury or treatment.

¶ 6              Five days later, on June 28, 2017, the State filed a petition for adjudication of neglect, alleging the minors' environment was injurious to their welfare when they resided with respondent because of her unresolved issues of domestic violence, anger management, alcohol and/or substance abuse, and mental-health issues. The same day, the trial court entered an *ex parte* temporary custody order, finding respondent's whereabouts were unknown. (The petition stated identical allegations against the putative father, Robert B., and in the temporary custody order found his whereabouts were unknown as well. Robert B.'s paternity was established though he is not a party to this appeal.)

¶ 7              In the June 28, 2017, temporary custody order, the trial court noted the family had

four prior indicated reports since February 2015, multiple domestic-violence incidents, a history of drug and alcohol misuse, and an "unhealthy" condition of the home. The court found an immediate and urgent necessity to remove the minors from the home based on the above, as well as the "extensive time missed from school" and respondent's lack of cooperation with services. (An intact family case was opened in November 2016, but respondent "quickly became uncooperative and [the] case was closed.") The "[c]urrent whereabouts of [the] minors [was] unknown." The court appointed the guardianship administrator of DCFS as temporary custodian and issued warrants for the apprehension of the minors.

¶ 8        The police searched the last known residence of respondent and found it in an uninhabitable condition. Apparently, respondent had abandoned the home. However, on July 7, 2017, the minors were located. The two older boys were found with an "unregistered sex offender," and the two younger boys were found with respondent. The minors were taken into custody and placed together with their paternal grandmother, Debbie B.

¶ 9                          A. Adjudicatory Proceedings

¶ 10        On August 22, 2017, the trial court issued an adjudicatory order finding the minors abused or neglected as defined by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)) in that the minors' environment was injurious to their welfare. The court accepted respondent's admission to a finding of neglect based upon her unresolved issues of alcohol and/or substance abuse. In exchange for her admission, the court dismissed the remainder of the State's allegations.

¶ 11        The trial court also issued a dispositional order on September 26, 2017, finding respondent, for reasons other than financial circumstances alone, to be unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline the minors and determining placement

with respondent was contrary to their health, safety, and best interest because "while she is attending visits, she is just getting started in services[.] She needs substance-abuse and parenting assessments. She will need to complete [domestic-violence] treatment and maintain stability and sobriety." The court granted the State's petition, adjudicated the minors neglected, and made them wards of the court. The court ordered DCFS to maintain custody and guardianship over the minors.

¶ 12                    B. Termination of Respondent's Parental Rights

¶ 13        On May 3, 2019, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit person pursuant to the Adoption Act (750 ILCS 50/1(D) (West 2018)) and identified three grounds supporting its allegation. The State dismissed one ground, leaving two grounds for trial: (1) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following adjudication of neglect, namely between June 12, 2018, and March 12, 2019, (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) she failed to make reasonable progress toward the return of the minors during any nine-month period following adjudication of neglect, namely between June 12, 2018, and March 12, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)). In its petition, the State also alleged termination of respondent's parental rights was in the minors' best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to their adoption.

¶ 14                            1. *The Fitness Proceedings*

¶ 15        On January 14, 2020, the trial court held a fitness hearing. The following evidence was presented.

¶ 16                        a. Testimony of Danielle Nichols

¶ 17        Danielle Nichols, a family caseworker for the Center for Youth and Family

- 4 -

Solutions (CYFS), testified she had been in her position for over two years. She was assigned this case on October 17, 2017, succeeding Michelle Brunner. To familiarize herself with the case, Nichols reviewed the integrated assessment and the service plan and spoke with Brunner.

¶ 18            Nichols testified the family had five prior indicated reports beginning in February 2015 based on conditions such as medical neglect, domestic violence, and inadequate food and shelter. The most recent indicated report (June 26, 2017) "would have been around the time that these children came into care[.]" At that time, the minors were residing with respondent in a home described as "not fit for human beings" in Bellflower. According to Nichols, the report also disclosed concerns of substance abuse, domestic violence, and truancy. With regard to substance abuse, Nichols said the minors reported respondent would fall asleep and "not wake up" and she would cook something on the stove and smoke it. As for domestic violence, Nichols recalled reading a police report for an altercation between respondent and "her recent paramour" that had occurred in the minors' presence.

¶ 19            Nichols testified she first met respondent at the integrated assessment on July 14, 2017. In Nichols's opinion, respondent "did not acknowledge or take accountability as to why" the minors were in care. Nichols next met with respondent at a child and family team meeting on October 13, 2017, to introduce Nichols as the new caseworker and to go over respondent's July 13, 2017, service plan. According to Nichols, respondent "was not concerned about discussing her service[s, only] phone calls with her children."

¶ 20            Nichols testified respondent's initial service-plan goals were to address substance abuse, housing, cooperation with the agency, parenting, domestic violence, visitation, and employment. For the substance-abuse goal, respondent was to submit to random drug screens, complete a substance-abuse evaluation, follow all recommendations, and refrain from the use of

alcohol and illegal drugs. For her housing goal, respondent was to establish suitable housing and maintain a clean environment. For her cooperation goal, respondent was to sign all consents, notify Nichols of any changes, and meet with Nichols on at least a monthly basis. For her parenting goal, respondent was to demonstrate parenting skills during visits, complete a parenting assessment, and participate in parenting classes as recommended. For her domestic-violence goal, respondent was to participate in a domestic-violence course and notify Nichols if any domestic-violence incident occurred. For visitation, respondent was to visit with the minors weekly, provide 24 hours' notice if she needed to reschedule or to confirm the appointment, implement what she learned in parenting classes, and provide healthy snacks. For her employment goal, respondent was to obtain employment and provide pay stubs.

¶ 21 Nichols testified that on December 21, 2018, she conducted an administrative case review of respondent's initial case plan. Respondent did not attend. Nichols rated respondent's progress on her substance-abuse goal as unsatisfactory. She had not completed any random drug screens and had not participated in a substance-abuse assessment. However, on December 8, 2017, respondent self-referred to Accent Counseling (an agency not used by CYFS) and participated in a self-report assessment. Respondent reported she used substances as a coping mechanism. Based on that assessment, Accent advised that respondent needed individual psychotherapy, which she attended until July 2018. (The State introduced Accent's report as an exhibit.) Nichols said she sent a referral to Accent Counseling sometime in January 2018 for substance-abuse treatment based upon the findings on the self-report assessment. However, as of December 2018, respondent had not engaged in treatment.

¶ 22 Nichols testified that, because respondent had moved to Bloomington, in January 2019, she referred her to Chestnut Health Systems for a substance-abuse assessment and treatment.

Two assessments were scheduled in February 2019, but respondent failed to appear. After her move to Bloomington, respondent was still required to call in to the agency daily for random drug screens, but the location was changed from Urbana to Bloomington. However, between the relevant nine-month period of June 12, 2018, and March 12, 2019, respondent did not submit any drug screens for the agency. On March 12, 2019, respondent was court ordered to submit to a drug screen. She tested positive for cannabis and amphetamines. Respondent claimed she had been prescribed Adderall, but she never submitted documentation. Prior to March 12, 2019, respondent had denied any drug usage and claimed she did not need substance-abuse treatment.

¶ 23        Nichols next testified about respondent's housing goal. During the summer of 2018, respondent claimed she was living and working in Tennessee, but she failed to provide any requested documentation to support her claim. In September 2018, respondent reported she was living in Tyler Bell's (her suspected paramour) mobile home in Gibson City. On October 24, 2018, Nichols visited the residence and created a home-safety checklist. The home was not suitable for the minors, as it had evidence of rodent infestation, exposed wiring, inoperable fire alarms, and dangerous construction tools in the kitchen.

¶ 24        According to Nichols's testimony, the previous foster parent, Danielle B., advised respondent was in a relationship with Bell though respondent denied it. In November 2018, respondent obtained an order of protection against Bell in Ford County. On the petition, respondent listed Bell as a former spouse. Nichols conducted a background check of Bell because respondent "was adamant" about Bell supervising her visits with the minors. Nichols said Bell's background check revealed "some DUIs, some substance-related convictions." Nichols found Bell was not an appropriate person to supervise visitation should the case be ready for third-party supervision. Due to Nichols's concern that respondent was in a relationship and residing with Bell, Nichols rated

respondent's progress on her housing goal as unsatisfactory. Further, respondent did not prove that the home-safety issues had been rectified, as she was not home during the next home visit on November 19, 2018. In January 2019, respondent notified Nichols she had moved alone to an apartment in Bloomington though again, she did not provide documentation. Nichols scheduled a time in early 2019 to visit the apartment, but she was unable to connect with respondent. Nichols's subsequent unannounced visit was also unsuccessful.

¶ 25    With regard to respondent's goal of cooperation, Nichols testified respondent's progress was rated unsatisfactory and remained so as of March 12, 2019, the end of the nine-month period. Although respondent signed the necessary consent forms and met with Nichols on occasion, she did not keep in regular contact and had not always advised Nichols of a change in her circumstances.

¶ 26    Despite successfully completing a parenting class on June 21, 2018, respondent's progress was rated unsatisfactory for her parenting goal. Respondent would often make false promises to the minors. Apparently, in November 2018, she promised they would be home by Christmas. Nichols said respondent did not realize the negative emotional impact this had on them. Respondent would also promise to bring something to the next visit but would fail to do so. She did not always provide appropriate food despite Nichols discussing the issue with her multiple times.

¶ 27    Nichols said in December 2018, respondent's progress was rated satisfactory on her goal of visitation. She consistently attended visits and engaged with the children. However, in early 2019, the two older boys began refusing visits because they would hear in court the status of the case and then hear opposite stories from respondent during visits. Nichols said they would hear from respondent at visits that "she was doing her classes and getting better and trying to get them

home." Nichols said, "looking at the other factors" of visitation, besides attendance, respondent's progress "probably should have been unsatisfactory."

¶ 28    Nichols testified respondent's progress on her domestic-violence goal was rated unsatisfactory because she had not begun treatment. On November 26, 2018, respondent was assessed at Cognition Works and treatment was recommended. Respondent reported she did not believe she needed domestic-violence services for "the incident that happened three years ago." Further, respondent told Nichols she was under the impression it was not mandatory. Nichols testified domestic violence services were included at the time of the integrated assessment due to incidents with the minors' father and others prior to the minors being taken into care. In January 2019, Nichols referred respondent to Chestnut in Bloomington for domestic-violence services, but respondent failed to attend.

¶ 29    Nichols also rated respondent's progress as unsatisfactory on her employment goal. During the nine-month period, respondent's only reported job was at a mechanic's shop in Tennessee, but Nichols never received any confirmation or documentation supporting respondent's claim.

¶ 30    Nichols testified that on December 28, 2017, she added a mental-health individual counseling goal for respondent. Nichols testified respondent was to participate in an assessment based upon Nichols's concerns about respondent's emotional stability. In December 2018, Nichols rated respondent's progress on this goal as unsatisfactory because respondent had not attended any mental-health services. She was referred to Community Resource Counseling Center in Paxton in August 2017. They unsuccessfully discharged her due to four missed appointments. Nichols also referred respondent for a psychological evaluation with Dr. Judy Osgood on December 10, 2018. Respondent did not attend, advising Dr. Osgood that she was not interested in an evaluation.

Nichols referred respondent to her agency for an assessment in January 2019, but respondent reported she was seeing a counselor in Champaign. Respondent did not provide the name of the counselor or any documentation proving her claim.

¶ 31    Nichols testified about a visit that occurred on January 8, 2019, which was the first visit D.B. had attended since June 12, 2018. Respondent began talking to the minors about stolen electronics and failing her drug screens. Nichols tried to redirect respondent and advise her those topics were not appropriate. However, respondent continued to discuss the topics with the minors. Nichols testified that, during the nine-month period between June 12, 2018, to March 12, 2019, respondent's visits were supervised, as unsupervised visits would not have been safe for the minors. According to Nichols, during that same time frame, respondent did not make enough progress for Nichols to recommend to the trial court that respondent be found fit.

¶ 32    The State rested. Respondent made a motion for a direct finding. The trial court found the State had presented a *prima facie* case and denied respondent's motion.

¶ 33                        b. Testimony of Patricia Ray

¶ 34    Respondent presented the testimony of Patricia Ray, the owner of Prevention and Treatment Services, a treatment center for substance abuse, mental health, domestic violence, anger management, parenting, and general counseling. The trial court qualified Ray as an expert witness in the areas of domestic-violence and substance-abuse treatment. Ray said she provided parenting services, anger-management services, a substance-abuse assessment, and a domestic-violence assessment to respondent for this case. She said respondent successfully completed parenting in June 2018 and anger management in July 2018. Ray said her curriculums are based on DCFS requirements.

¶ 35    In Ray's opinion, respondent would not have been a risk to the minors if they were

returned home in June or July 2018, if she was not in a relationship with the minors' father. During the fall of 2019, Ray performed a substance-abuse assessment, a risk assessment, a mental-health risk assessment for domestic violence, and a mental-health assessment. Given that these assessments occurred outside the relevant nine-month period, Ray was unable to give her opinion about respondent's status prior to March 12, 2019.

¶ 36                                  c. Testimony of Ramone Pippins

¶ 37          Respondent also called Ramone Pippins as a witness on her behalf. Pippins testified he supervised 8 to 10 of respondent's visits with the minors for CYFS in late 2017 to 2018. He would take notes during the visit and prepare a report for Nichols. He said Nichols would ask him to "be a little more detailed with some of the negative things that might have happened in the visit." Pippins said Nichols asked him to concentrate on the negative aspects of the visits in his reports so CYFS would "have something against" respondent and to "pretty much get the boys to the foster home."

¶ 38                                  d. Rebuttal Testimony of Danielle Nichols

¶ 39          The State recalled Nichols to the stand as a rebuttal witness. She said Pippens stopped supervising visits for respondent's case in May 2019. He left the agency in November 2019. He was removed from the case because he was "too invested in the case. He made inappropriate contact with [respondent] on his personal cell phone" and other things Nichols was not personally aware of. Nichols denied asking Pippins to include more negative information in his visitation reports. When the goal was "return home," Nichols said she worked toward reunification of respondent and the minors.

¶ 40                                  e. Trial Court's Fitness Decision

¶ 41          After considering the evidence and arguments of counsel, the trial court addressed

- 11 -

the State's allegation of unfitness based upon respondent's failure to make reasonable efforts to correct the conditions that led to the minors' removal from her care. The court noted the "primary issue" was respondent's unresolved substance abuse. During the nine-month period, respondent (1) was not consistently calling in for drug screens, (2) was not consistently attending counseling at Accent, (3) did not provide proof of completion of any treatment provided at Accent, (4) did not participate in an assessment at Chestnut Health Systems, and (5) tested positive for cannabis and amphetamines in a court-ordered drug screen. The court further noted that, other than respondent's regular attendance at visitation, she did not participate in most of her recommended services during the nine-month period. The court stated:

"So, again, looking at the reasons for the removal, the question is, have reasonable efforts been made to correct the conditions? While I've stated that some things have been accomplished, such as completing the parenting classes, doing a substance-abuse assessment, and a domestic-violence assessment, efforts in addressing the counseling as required from the substance-abuse assessment, and from the domestic-violence assessment, were not reasonable. There is nothing that tells me that there were transportation issues, disabilities, impediments to completing those services. [Respondent] just did not complete the treatment pursuant to Accent. She didn't call in to inquire according to the service plan. She did not—there were no results of screens. We had a positive screen as ordered by the court. We had several, again, DV assessments, domestic-violence assessments, but no evidence that the treatment was ever completed in that nine-month period.

So based upon the court's analysis, the court believes that sufficient enough evidence has been presented, evidence by clear and convincing evidence that

[respondent] has failed to make a reasonable effort, will find [that allegation] proven."

¶ 42    In addressing respondent's reasonable progress, the trial court found its "analysis of the substance-abuse and domestic-violence issues applies here as well." Noting the objective standard under which it must evaluate progress, the court concluded respondent failed to make reasonable progress, "given [the court's] understanding of [respondent's] abilities as [they] relate[ ] to the services." The court found as follows:

> "So when we look at the lack of completion of individual counseling or psychotherapy, no engagement in domestic-violence therapy or counseling, failing to screen, call in, screen, having a positive screen, not undertaking the psychological evaluation or engaging in that process, objectively speaking, the court looks at the evidence that's been presented. Court believes the State has established by clear and convincing evidence that [respondent] has failed to make reasonable progress towards the return home based upon her failure to comply with the service plan task."

The court found respondent unfit.

¶ 43                        2. *Best-Interests Hearing*

¶ 44    The trial court proceeded to the best-interest hearing. The State offered the best-interest reports of the agency caseworker and the court appointed special advocate. The court allowed the admission of both reports and advised it would consider the same.

¶ 45                        a. Testimony of Brenda Sommer

¶ 46    The State presented the testimony of Brenda Sommer, a clinical therapist at Behavioral Wellness Center, who served as counselor to D.B. and P.B. Sommer said she began

- 13 -

weekly therapy with D.B. in March 2018. He was originally diagnosed with adjustment disorder and childhood neglect. In August 2018, he "moved to" a diagnosis of post-traumatic stress disorder and generalized anxiety disorder. According to Sommer, D.B.'s disorders stemmed from traumatic experiences from worry, caring for his brothers, neglect, worrying about respondent's safety, and worrying about repeated relocations. Sommer said D.B. has been receptive to and has benefitted from therapy.

¶ 47        Sommer indicated that D.B. expressed his desire to be adopted by his foster parents. She said he "appreciates the consistency." His grades have improved, he is sleeping better, and he appreciates the stability and structure of the foster home. Sommer said she has seen the growing bond between D.B. and his foster parents. She said D.B. struggles with being in foster care because kids at school ask "too many questions and might make fun." She said: "It's embarrassing. He just wants it to be done. *** He wants closure." In Sommer's opinion, terminating respondent's parental rights to D.B. would be in his best interests. She said not terminating respondent's parental rights would definitely have a negative impact on D.B., as he described it to her, he "would start all over again. And he would have to go back to being the protector."

¶ 48        Sommer testified she began therapy with P.B. in June 2019. He was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct with a history of child neglect. He had difficulty expressing thoughts and feelings appropriately, as he would emotionally and physically act out. Sommer said P.B. was often disappointed by things his biological parents did or failed to do, which made him angry and depressed. P.B. wants to live long-term with his foster parents, which, according to Sommer, would be in P.B.'s best interests. He has a bond with his foster parents, and he feels safe and secure in their home. In Sommer's opinion, it would be in P.B.'s best interests to terminate respondent's parental rights so "he can have a consistent home, a

- 14 -

loving home, stability, the security and safety."

¶ 49                              b. Testimony of Sara Williamson

¶ 50            The State next called Sara Williamson, a licensed clinical social worker at Behavioral Wellness Center, providing individual therapy to J.B. She began treating J.B. weekly in March 2018. He was diagnosed with child neglect. Williamson focused on providing J.B. support with processing any trauma he had experienced. She had transitioned to helping him process feelings related to being in foster care. He had made improvements in therapy, as he was more open about his thoughts and feelings. They had not "delved into a lot of the trauma that was reported initially" because Williamson did not want to force the issue. She was focusing on developing a trusting relationship with him.

¶ 51            According to Williamson, J.B. transitioned to his current foster placement "pretty well," as he seems to be "very resilient." He had realized that an environment with structure and routine was beneficial for him. He had become more trusting of adults. Williamson said J.B. does not have a strong relationship with respondent because he does not trust her. She believed he trusted his foster parents and had a strong bond and overall healthy relationship with them. J.B. reportedly wants closure and wants to be adopted by his foster parents. Williamson believed terminating respondent's parental rights would be in J.B.'s best interests.

¶ 52                              c. Testimony of Matthew Putney

¶ 53            The State called the minors' foster parent, Matthew Putney, as a witness. He testified the boys came into his and his wife Lisa's home in November 2018. They live in a three-bedroom, two-bathroom ranch-style home. He said P.B. and L.B. share a bedroom and D.B. and J.B. share another bedroom. The boys have all made friends in the neighborhood and they enjoy the nearby parks, playgrounds, and splash pad. They often go as a family to their foster

grandparents' home to enjoy their theater room, which the boys "really, really enjoy." They are all doing well in school after a "rocky" start and have established plenty of friendships. Three boys play sports; J.B. enjoys art. The minors have maintained a close relationship with their biological cousins, which Putney says he will continue to support. Their health and hygiene had significantly improved.

¶ 54　　　　Putney said the minors are all very bonded to one another and have each developed a strong relationship with Putney and his wife. Putney loves the minors and is committed to providing permanency through adoption should the trial court terminate the biological parents' parental rights. In Putney's opinion, it would be in the minors' best interests for the court to terminate parental rights because "not only do the children want it, but [he] think[s] at this point in time it's probably just the right thing to do." The minors have expressed their desire to be adopted. According to Putney, the minors enjoy a routine, feel safe and secure, and are ready for stability.

¶ 55　　　　　　　　　　d. Testimony of Lisa Putney

¶ 56　　　　Finally, the State called the foster mother, Lisa Putney, as a witness. She testified consistently with her husband regarding the minors' desires, interests, progression, and health. She expressed her desire to adopt the minors and her belief that it would be in their best interests to terminate the biological parents' parental rights.

¶ 57　　　　　　　　　　e. Testimony of Patti W.

¶ 58　　　　Respondent called her mother, Patti W., as a witness. She said she has always had a close relationship with the minors but has had a difficult relationship with respondent. She and respondent have "just butted heads over everything." Patti said respondent and the minors shared a loving bond and it was very difficult for them being removed from respondent's care. The minors

were initially placed with their paternal grandparents, then were moved to their paternal aunt's home, and then were moved into the Putney's home.

¶ 59        In April 2019, Lisa refused to allow Patti to have contact with the minors because, according to Patti, Lisa "didn't trust [her] anymore because she had a gut feeling [Patti] was talking to [respondent]." Patti said she apologized to Lisa but "[i]t just kind of drove a wedge between [them]."

¶ 60        Patti said respondent began living with her in July 2019. She has seen a change in respondent since that time because she stopped using Adderall, though she was still using marijuana. She was calmer and not as quick to anger. Patti said respondent was participating in counseling at Truth In Love and was benefitting from it. Since July 2019, respondent has called in for drug screens every day. In Patti's opinion, the minors' best interests would be served by being reunited permanently with respondent.

¶ 61                            f. Testimony of Respondent

¶ 62        Respondent testified on her own behalf. She acknowledged, before June 2017 when the minors were placed in care, she had been their exclusive caretaker. When DCFS removed the minors from her custody, D.B. was 11 years old, J.B. was 9 years old, P.B. was 7 years old, and L.B. was 5 years old. She further acknowledged there was domestic violence between her and the minors' father. In 2016, they separated, and the boys stayed with her. She admitted she was "horrible" about making them go to school. She wanted to assure them she was not going to leave them so they would stay home together.

¶ 63        Respondent explained the reason the minors were "filthy" on the day L.B. was taken to the hospital for the dog bite. She said they were at a friend's farm where respondent was working. They had been outside all day and were admittedly dirty. Due to ongoing conflicts, she

- 17 -

assumed the biological father's extended family reported the incident to DCFS. When the minors were taken into protective custody, they were placed with these extended family members. Respondent also explained she got along well with the first caseworker and was making progress in the case. According to respondent, within a month of being placed with their paternal grandparents, a family member hung himself in the grandparents' front yard. D.B. would then say he wanted to kill himself, yet no therapy was recommended.

¶ 64        Respondent testified she could not recall when Nichols assumed caseworker duties, but she recalled Nichols telling respondent she could not cry at visits or they would be terminated. Respondent admitted she cried at visits because she and the minors "went from not spending two hours apart from each other to two hours a week. Of course [they] cried." Respondent said her relationship with Nichols was worse than with the prior caseworker. She said Nichols would "make little smile remarks about stuff" knowing respondent "couldn't fight back." As a result of seeing her just "sit there," respondent claims the boys developed a negative impression of her.

¶ 65        Respondent testified she "did all of the stuff that [she] was supposed to" according to her initial service plan: anger management, parenting, and a mental-health evaluation. She believed domestic violence was added later. She participated in a domestic-violence assessment at Cognition Works in the winter of 2018. According to respondent, she was not recommended for domestic-violence classes. She also said she participated in a combined substance-abuse assessment and a mental-health assessment at Accent Counseling at the beginning of the case in 2017. The results of the substance-abuse assessment indicated she needed counseling. In respondent's opinion, her service plan was not successfully fulfilled because she did not have a driver's license. She said after drug screens were added to her service plan, she called Prairie Center, as she thought she was supposed to, every day. She later discovered she was supposed to

be calling CYFS. At a court hearing, when the minors were present, the State informed the trial court, she had failed 30 drug screens when actually she had been calling the wrong agency. She admitted that, once she learned to call CYFS, she was only calling sporadically because she lived in Tennessee.

¶ 66 Respondent admitted testing positive for amphetamines but, she claims, that was due to her prescribed Adderall. When she admitted at the adjudicatory hearing that the minors were at risk due to her substance abuse, she was referring to her prescribed Adderall. She said she stopped taking Adderall in April 2019. In her opinion, the minors' best interests would be served by being returned to her custody.

¶ 67                          g. Trial Court's Best Interest Decision

¶ 68 After considering the evidence, the best-interest reports, recommendations of counsel, and the statutory best-interest factors, the trial court found the State had proved by a preponderance of the evidence that it was in the minors' best interests that respondent's parental rights be terminated. The court considered D.B.'s and J.B.'s desire to be adopted, the safety and security of the foster home, the minors' opportunity "to be kids again," and the prospect of permanency through adoption.

¶ 69 This appeal followed.

¶ 70                               II. ANALYSIS

¶ 71                          A. The Finding of Parental Unfitness

¶ 72 There are two steps to the involuntary termination of parental rights. First, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2) (West 2018)); *In re M.I.*, 2016 IL 120232, ¶ 20. If the State proves that the parent meets one of the

- 19 -

definitions of an "unfit person" in section 1(D), the trial court will hold a subsequent and separate hearing, in which the State must prove, by a preponderance of the evidence (*In re D.T.*, 212 Ill. 2d 347, 367 (2004)), that the proposed termination of parental rights would be in the children's best interests. 705 ILCS 405/2-29(2) (West 2018); *M.I.*, 2016 IL 120232, ¶ 20.

¶ 73     When a parent appeals the trial court's findings that she is an "unfit person" and that terminating parental rights is in the best interests of the children, we do not retry the case but instead limit ourselves to deciding whether the court's findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008); *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005). This is a deferential standard of review. A finding is against the manifest weight of the evidence only if the evidence "clearly" calls for the opposite finding (*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)), such that "no reasonable person" could arrive at the trial court's finding on the basis of the evidence in the record (*Mizell v. Passo*, 147 Ill. 2d 420, 425-26 (1992); *Baker v. Daniel S. Berger, Ltd.*, 323 Ill. App. 3d 956, 963 (2001)).

¶ 74     Therefore, we begin by considering whether it is "clearly evident" from the evidence in the record that the State failed to prove, by clear and convincing evidence, that respondent met the definition of an "unfit person" as alleged in the State's petition to terminate her parental rights. *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). The State alleged that respondent was an "unfit person" for failing to make reasonable progress or reasonable efforts during the nine-month period of June 12, 2018, through March 12, 2019. 750 ILCS 50/1(D)(m)(i), (ii) (West 2018).

¶ 75     Before we address the trial court's finding of unfitness on either ground, we will briefly address respondent's two other claimed errors from the fitness hearing. First, respondent argues the court erred in denying her motion for a directed finding after the presentation of the State's case. We need not address the issue of the propriety of the court's denial because

respondent has waived her right to challenge that denial. See 735 ILCS 5/2-1110 (West 2018) (permitting a defendant in a nonjury case to move for a finding in her favor at the close of the plaintiff's case and "[i]f the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived"); see also *People v. Wilson*, 143 Ill. 2d 236, 245 (1991). Respondent did not renew her motion at the close of all the evidence, and therefore, she has waived review of the court's denial. "The obvious reason for that result is the trial court's ruling on the motion becomes merged into the judgment." *In re L.M.*, 205 Ill. App. 3d 497, 513 (1990). Accordingly, we will address the question of whether the evidence at trial, taken as a whole, was sufficient to support the court's finding of unfitness.

¶ 76        Second, respondent contends the trial court erred by failing to consider Patricia Ray's testimony that respondent had fulfilled some service-plan requirements outside of the designated nine-month period. She claims it is unconstitutional to ignore evidence of recovery regardless of the time frame. *Cf.* 750 ILCS 50/1(D)(m)(ii) (West 2018) (stating a particular nine-month period must be specified).

¶ 77        As respondent acknowledges, the law is clear the courts should evaluate a parent's reasonable progress only occurring during the designated nine-month period. Anything outside of that period is irrelevant. *In re J.L.*, 236 Ill. 2d 329, 341 (2010). That is, a court is not permitted to consider any evidence outside the nine-month period. *In re D.F.*, 208 Ill. 2d 223, 242-43 (2003). In light of the clear line of authority on this issue, respondent has failed to demonstrate any reason for this court to rebut that authority or the presumption of the statute's constitutionality. See *In re D.W.*, 214 Ill. 2d 289, 310 (2005) (noting courts begin with the presumption the statute is constitutional). Therefore, we find no error with the trial court's disregard of evidence outside the nine-month period.

¶ 78 We now turn to the propriety of the trial court's determination that respondent was an "unfit person." The State alleged respondent was unfit for failing to make reasonable efforts and/or reasonable progress. Under section 1(D)(m)(ii), "reasonable progress" is an objective standard requiring, "at a minimum, the parent [to] make measurable steps toward the goal of reunification through compliance with court directives, service plans or both." *In re S.H.*, 2014 IL App (3d) 140500, ¶ 30. The "benchmark" for the parent encompasses "compliance with the service plan and the court's directives in light of the conditions causing removal, as well as other conditions that would prevent the court from returning the minor to the parent's custody." *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22; See also *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists if the trial court can conclude the progress made by the parent to comply with directives for the return of the minors is "sufficiently demonstrable and of such a quality" that the trial court can order the minors returned to the parent "in the near future." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. The court will be able to order the child[ren] returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child[ren]." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). This court has also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 79 In this case, the condition that brought the minors into care was respondent's substance abuse. In fact, at the adjudicatory hearing, respondent admitted the minors were neglected based upon her unresolved issues of substance abuse. Multiple secondary issues, including a risk of domestic violence, providing a clean, safe, and appropriate home environment, and respondent's mental health, were also identified as concerns and were included in respondent's

service plan.

¶ 80    Nichols testified respondent was to submit to random drug screens, complete a substance-abuse assessment, follow all treatment recommendations, and refrain from the use of alcohol and illegal drugs. During the relevant nine-month period, according to Nichols, respondent called in sporadically for drug screens and participated in none. In March 2019, at the end of the nine-month period, because there had been no drug screens reported, the trial court ordered respondent to participate. Respondent submitted and tested positive for cannabis and amphetamines. She had not participated in the agency's referral for a substance-abuse assessment and therefore, had not participated in any treatment. She was not attending individual counseling, was not attending any domestic-violence victim groups, and had not participated in a psychological evaluation. Aside from her failure to complete the required services, the evidence demonstrated she denied a need for services and continuously failed to heed warnings about her inappropriate conversations with the minors at visitation. According to Nichols, respondent was uncooperative and defiant. Although respondent had completed parenting services, participated in a self-reported substance-abuse assessment, and regularly attended visits with the minors, those tasks, under an objective standard, do not make up for the complete lack of compliance with regard to the majority of respondent's service-plan tasks. Based on this evidence, the trial court determined the State had established by clear and convincing evidence that respondent failed to make reasonable progress and found her unfit.

¶ 81    The evidence supports the trial court's finding. Respondent did not comply with the service plan directives and was in no position to have the minors returned to her care in the near future. See *D.T.*, 2017 IL App (3d) 170120, ¶ 17. For the court to consider the minors' return to respondent, the court would have had to find respondent "fully complied" with her service-plan

- 23 -

directives. *L.L.S.*, 218 Ill. App. 3d at 461. Respondent was nowhere close to this level of compliance. Accordingly, we find the State's evidence was sufficient to prove by clear and convincing evidence respondent failed to make reasonable progress toward the return of the minors during the relevant nine-month period. We need not address respondent's reasonable efforts. Despite the allegation of another potential basis for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 82                                    B. Best-Interests Finding

¶ 83            Once a trial court finds a parent to be an "unfit person," it must then consider the children's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's familial, cultural[,] and religious
> background and ties; (4) the child's sense of attachments, including
> love, security, familiarity, continuity of affection, and the least
> disruptive placement alternative; (5) the child's wishes and long-
> term goals; (6) the child's community ties; (7) the child's need for
> permanence, including the need for stability and continuity of

relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child."

*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 84 A reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate the court should have reached the opposite result. *Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 85 Our review of the best interest factors demonstrates that the minors' best interest favored terminating respondent's parental rights. The evidence demonstrated that the minors' physical safety and welfare—including food, shelter, and clothing—were met by the foster family. The development of identity of the minors also progressed in their placement, as they were in a safe environment and, as the trial court stated, they had the opportunity "to be kids again." The minors bonded with their foster parents. Additionally, community ties were developed as the minors had made friends in the neighborhood and at their new school. They were also getting their medical, dental, and mental-health needs addressed. The minors were thriving in this home setting and each had expressed their desire to remain there permanently. This is important because "[i]f the minor is over 14 years of age, the court may, in its discretion, consider the wishes of the minor in determining whether the best interests of the minor would be promoted by the finding of the

- 25 -

unfitness of a non-consenting parent." 705 ILCS 405/2-29(2) (West 2018). At the time of the best-interest hearing, D.B. was 14 years old, had stopped attending visits with respondent, and was ready to achieve permanence in the Putney's home.

¶ 86    The minors had been in placement for two-and-a-half years without any indication that respondent would meet the requirements to become fit or even be able to appropriately care for the minors. The foster parents expressed their desire to provide the minors with permanency through adoption.

¶ 87    The trial court considered the evidence, the best-interest reports, and the statutory factors. The court heavily relied on the minors' therapists in evaluating the substantial progress each child had made during treatment, especially within the past 14 months while residing in their potential adoptive placement.

¶ 88    The trial court could reasonably take the view that the loving and stable foster home where the children had been residing since November 2018, and where the foster parents were willing to adopt them, offered the children the best hope of permanency. See 705 ILCS 405/1-3(4.05)(d), (f), (g) (West 2018). Because the evidence does not lead us clearly to the opposite conclusion, we find the court's best-interests determination was not against the manifest weight of the evidence.

¶ 89                                    III. CONCLUSION

¶ 90    For the reasons stated, we affirm the trial court's judgment.

¶ 91    Affirmed.